**UNITED STATES COURT OF APPEALS**

**TENCH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff – Appellee,

v.

CHRISTOPHER SHAWN SEYMOUR,

      Defendant – Appellant.

No. 14-8009
(D.C. No. 1:13-CR-00175-NDF-1)
(D. Wyo.)

**ORDER AND JUDGMENT***

Before **LUCERO**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

After a successful undercover law enforcement operation, Christopher Seymour was charged with the online enticement of a child and with carrying a firearm during and in relation to a crime of violence. At trial, Seymour defended against the charges by portraying himself as a child protector instead of a sexual predator. The jury convicted him of all charges. He appeals on three bases: (1) that the district court erred by denying his motion for continuance; (2) that the district court erred in several of its evidentiary rulings; and (3) that the district court erred by sustaining his conviction for violating 18

---

    * This order and judgment is not binding precedent except under the doctrines of law of the case, claim preclusion, and issue preclusion. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

U.S.C. § 924(c) without sufficient evidence. Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Special Agent Brent Metcalfe, a member of the Wyoming Internet Crimes Against Children Task Force ("ICAC"), specializes in investigating crimes of child exploitation and child pornography. In July 2013, ICAC focused on stopping Internet crimes against children during Cheyenne Frontier Days, a weeklong western celebration featuring several rodeos and other entertainment.

On July 23, 2013, S.A. Metcalfe placed an advertisement in the "Casual Encounters" section of the Craigslist webpage for Cheyenne, Wyoming. The title of the advertisement was "Custodial Dad MW4M[1] (Cheyenne)." The ad read, "Passing through Cheyenne with my d-a-u. If you are looking for some 'fresh' fun contact me." S.A. Metcalfe testified that "d-a-u" is "used in the online trade of child pornography to signify daughter." R. vol. 3, at 109. He used the word "fresh" "to see what [the people responding] . . . would classify as fresh." *Id.* at 110. S.A. Metcalfe explained, "I was interested in finding somebody that would basically take the word fresh and put it to a more sinister use. . . . To basically look for a young child to have sex with, preferably female." *Id.*

Consistent with his training, S.A. Metcalfe let persons responding to the advertisement lead the conversation, describing his role as being a "passive participant"

---

[1] MW4M means "man/woman for man," a subsection of Craigslist's Cheyenne webpage.

in the conversation. In particular, he was trained "to have [the other person] solicit sexual acts of a minor from me first." *Id.* at 144.

S.A. Metcalfe received ten or fifteen responses to the advertisement. One response was from "CS," almost an hour after posting the advertisement. "CS" said, "Absolutely!! Sounds like it could be perfect for me!! Please let me know more!" At trial, Seymour admitted to being "CS." The rest of the exchange went as follows:

> **S.A. Metcalfe (6:09 p.m.)**: what are you lookin for
>
> **Seymour (6:12 p.m.)**: An hour or a few with a fresh girl. You say your daughter is. Are you looking for anything?
>
> **Seymour (6:38 p.m.)**: My bad. I must have misunderstood your ad. Thought it was a pay to play or trade to play thing. Didn't mean to offend.
>
> **S.A. Metcalfe (7:21 p.m.)**: im just lookin for cash
>
> **Seymour (8:07 p.m.)**: Ok. How much? What she look like?
>
> **S.A. Metcalfe (8:11 p.m.)**: price depends on what you want to do. Shes 4'9 brown hair and green eyes
>
> **Seymour (8:14 p.m.)**: oral an prolly anal as well as vag. No pics?
>
> **S.A. Metcalfe (8:20 p.m.)**: K. and no pics I dont want to get in trouble
>
> **Seymour (8:21 p.m.)**: K. How much?
>
> **Seymour (8:21 p.m.)**: Can you bring her here?
>
> **S.A. Metcalfe (8:23 p.m.)**: where is here
>
> **Seymour (8:26 p.m.)**: In Cheyenne. Just off pershing on Maxwell.
>
> **S.A. Metcalfe (8:29 p.m.)**: i think we can figure something out yeah. im not to familiar with chayenne. whats fair for you
>
> **Seymour (8:32 p.m.)**: I haven't seen her. 100?

**S.A. Metcalfe (8:35 p.m.)**: 100 sounds fair.

**Seymour (8:37 p.m.)**: K. Where you at?

**S.A. Metcalfe (8:42 p.m.)**: is anybody else there, i trust you. I just don't want my daughter to be in a dangerous situation

**Seymour (8:44 p.m.)**: Other people live in the house. I'm just renting the camper in the driveway. Nobody else in the camper but me

**S.A. Metcalfe (8:50 p.m.)**: ok good. is it private? my princess is excited to meet someone new.

**Seymour (8:51 p.m.)**: Yeah it pretty private. Like I say there folks in the house but not in here

**S.A. Metcalfe (8:59 p.m.)**: my 12 year old is named Bri, whats yours and you have the cash?

**Seymour (9:00 p.m.)**: Craig and yeah

**Seymour (9:03 p.m.)**: You dropping her off then when you be back to pick her up?

**S.A. Metcalfe (9:10 p.m.)**: im trying to figure out a ride right now.

**Seymour (9:11 p.m.)**: Where you at? Maybe I can pick her up

**S.A. Metcalfe (9:20 p.m.)**: im okay for 100 for oral and vag. If you want to take pictures or anal its going to cost more. since i wont be there i want to establish that

**Seymour (9:20 p.m.)**: Ok.

**S.A. Metcalfe (9:26 p.m.)**: ok meaning?

**Seymour (9:28 p.m.)**: Meaning I don't have to do either. How much extra though? Is this gonna happen though? Getting late.

**S.A. Metcalfe (9:30 p.m.)**: 50 seems fair to me since i wont be there. yeah i can walk her to this park so she can be picked up.

**Seymour (9:33 p.m.)**: Ok. What park?

**S.A. Metcalfe (9:38 p.m.)**: im not sure of the name but its off of parsely on the south side. some community center. you going to take pictures? if so 150

**Seymour (9:38 p.m.)**: Ok. Don't know where you talking about though

**S.A. Metcalfe (9:41 p.m.)**: its over by the eagles nest bar. its a new community center i think its called romero park. waht will you be driving

**Seymour (9:43 p.m.)**: How long?

**Seymour (9:43 p.m.)**: Red ford diesel Have her be at spotlight on Ames where it goes under underpass

**S.A. Metcalfe (9:48 p.m.)**: ok we will start that way, be there in 15

**Seymour (9:49 p.m.)**: Ok

**Seymour (10:04 p.m.)**: Didn't see anyone

Appellant's Br. Addendum, ex. 3, at 15–23.

Soon after this exchange, other ICAC agents set up surveillance at Romero Park. S.A. Metcalfe arrived at the park around 9:55 p.m. Minutes later the agents saw a red Ford diesel pickup truck enter and park in Romero Park. The agents then surrounded the truck. One agent saw the driver moving around in the front seat before the agents ordered the driver out of the truck. At trial, S.A. Metcalfe identified Seymour as the driver.

When Seymour got out of the truck, he wore a black nylon holster on his hip. The agents found in his  pocket $160 cash, all in 20 dollar bills, and an ATM receipt for all of the cash. The receipt was dated that same night at 8:40:31 p.m. They also found an HTC smartphone in the truck. Seymour denied using the cellphone to access Craigslist, telling

S.A. Metcalfe that he had only used the phone to call a friend who was staying at a nearby hotel. In the center console of Seymour's truck, the agents found a loaded pistol.

Soon afterward, the agents obtained a search warrant for Seymour's cell phone and residence—a trailer parked in a driveway. On the cell phone, the agents found the email exchange between S.A. Metcalfe and Seymour, quoted above.[2] The call history on the phone did not show any calls being placed on July 23, 2013. From Seymour's trailer, the agents seized a desktop computer, three laptops, and two cell phones. Although Seymour claimed that he was renting the trailer out to a friend, the agents found no evidence that anyone but Seymour lived there.

On September 30, 2013, eight days before trial, the government filed its notice of intent to use Fed. R. Evid. 404(b) evidence and its notice of intent to offer S.A. Metcalfe as an expert. The government notified Seymour that it intended to call S.A. Metcalfe to testify "that he conducted a forensic examination on the Defendant's computer seized from his residence. S.A. Metcalf[e] will testify that during the forensic examination, he found one movie file depicting child pornography under the file path: /Users/Master/Documents/Hold/Mount; the movie file was titled, 'BabyJ-Little-Bit.avi[.']] S.A. Metcalfe viewed the movie and will testify that it contained child pornography." R. vol. 1, at 22. As non-propensity purposes, the government identified "a number of proper purposes, including (but not limited to) identity, opportunity, knowledge and intent." *Id.* at 23. The government also notified Seymour that it intended to call S.A. Metcalfe to

---

[2] S.A. Metcalfe did search through the phone before obtaining a search warrant, which he explained was his attempt at "preserving the evidence." R. vol. 3, at 224. This is not at issue on appeal.

testify as an expert in the field of Internet crimes against children. S.A. Metcalfe would testify, for instance:

> [A]bout his investigation, preservation, and retrieval of programs, files, directories, photographs, "movies," and other information on Defendant's computer hard drives, cell phone and micro SD card contained in the cell phone. This testimony will include, but is not limited to, retrieval of digital data from the cell phone; peer-to-peer file trading software and its use on the Defendant's computers, the Internet history of the Defendant's computers, including the downloading of file(s) containing images of child pornography and where those files were found within the file structure of the Defendant's computers; the Defendant's use of peer-to-peer software, and related evidence.

*Id.* at 27.

In response, on October 2, 2013, Seymour filed a Motion to Continue the Jury Trial, which was set six days later. Seymour explained that he "now wishe[d] to view the video. Defendant has identified an adult female who may be the person in the video." *Id.* at 34. He also objected "to the Government's 404(b) evidence and object[ed] on lack of timely notice and not meeting the 404(b) test for introduction and Defendant will be requesting a pre-trial hearing on this 404(b) evidence."[3] *Id.* at 35. Seymour argued that "the late disclosure by the Government of this evidence has prejudiced him. . . . Defendant is now faced with possibly obtaining his own expert witness to counter the Government's expert witness on age determination of the female in the video clip and/or determination of ways such video could have been place[d] on the computer." *Id.*

---

[3] Under Fed. R. Evid. 404(b)(2), "On request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice."

In sum, Seymour justified his motion for continuance on four bases: (1) Seymour wanted to view the video; (2) Seymour wanted to communicate with a female who he thought might be the person depicted in the video; (3) Seymour wanted more time to examine and consider the video because, in his view, the government had not provided sufficient notice of it under Rule 404(b); and (4) Seymour possibly wanted to obtain an expert witness who could testify that the person in the video was an adult, not a child, or who could determine how someone else could have placed the video on his computer.

The district court examined those requests, concluded that the video was likely too prejudicial under Rule 403, and excluded the video. The district court concluded that "there [was] nothing in the Government's notice that would indicate how or why the video would be proper . . . ." *Id.* at 39. "At this time, the Court does not intend to allow the video into evidence based on Fed. R. Evid. 403 concerns. Therefore, at this time there is no reason to continue this matter to allow Defendant to get an expert." *Id.* The court ordered the trial to proceed as scheduled.

The government then withdrew its notice of intent to use the Rule 404(b) evidence. It explained that:

> [T]he United States has decided not to introduce any 404(b) type evidence during its case-in-chief. However, should the Defendant open the door to the use of such evidence by statements of counsel, questions asked on cross examination of government witnesses, or through testimony or evidence during the defendant's [case-in-chief] then the Government reserves the right to reference and use the evidence referenced . . . above.

*Id.* at 43.

Seymour's defense at trial—as characterized by the district court—was that he had acted as a vigilante to rescue the young girl. As explained to us on appeal, "Mr. Seymour gets angry at people who abuse others," and "he was taking matters into his own hands to get this guy." Appellant's Br. at 15.

In support, Seymour's mother testified that he had previously come to the aid of a woman in need and that he had saved one of his sisters from a beating. She explained that when Seymour was fifteen or sixteen years old, he and his brother heard a woman screaming. They discovered a man who had torn the blouse off of his wife and was beating her with his belt. Seymour's mother said, "And the boys, believe me, they took care of it. And that guy is never going to beat her again. Then they brought her up to the house. Oh, her poor back." R. vol. 3, at 291. His mother testified that on another occasion Seymour helped a horse. A man had gotten drunk and was beating a horse with leather straps, causing the horse to bleed. Seymour "took the strap away from the guy" and then beat him with it. *Id.* at 292. Finally, his mother testified that on another occasion a man was beating up her daughter, and Seymour intervened and broke the man's arm.

Seymour's adult son testified that Seymour always carried a gun for his personal defense. He said that Seymour always kept a pistol with him in the middle console or glove box of his truck. The son explained, "For example, when he's driving to work . . . he always has it in his glove box, just in case, because he has thousands of dollars' worth of expensive equipment in his truck, needs to be able to defend it. And he exercises that right to defend it." *Id.* at 295. He also testified that his father had once seen him being bullied as a child and intervened.

Seymour's wife also testified. She said that he always carries a pistol and that when he drives, he puts the pistol "in the glove box or in an area where it may be easily accessible." *Id.* at 302. She explained that she has "always seen him take matters into his own hands." *Id.* She said, "With my kids, I had an issue with my youngest having sticky fingers. And so he [Seymour] would take it into his own hands as far as making sure that he [her son] was aware that what he was doing was wrong, and he would correct the situation on several occasions." *Id.* at 303.

Seymour's sister also testified. She, like the others, said that Seymour always carried a pistol. Again like the other witnesses, she explained that Seymour always took matters into his own hands. She said, "Back in high school he used to tell Mom, 'oh, I'll handle it.' That was his favorite thing." *Id.* at 329. On one occasion, her daughter was being teased, and Seymour went to the school and talked to the children. After that, she said, the teasing stopped. Another time, she explained, her sister's husband was sexually abusing their children, and Seymour told her that he was going to take care of it. Seymour talked to the husband, and the husband moved to Alabama and did not bother the children anymore. She also explained that Seymour never had problems being around her children or grandchildren. She said, "They loved him. Yeah, they was always crawling all over him." She also said that Seymour has never had any problems with the other children in the family.

Seymour also testified on his own behalf. He explained that on the day of his arrest he had gone shooting out at Vedauwoo, an unpopulated area near Cheyenne. He said that he always wears a holster on his hip and carries a gun. He said that he had been surfing the

Internet on July 23, 2013, including Craigslist, looking for "undesirables" and "perverts." *Id.* at 342, 349. He defined a pervert as a father who wants to "pimp out" his daughter and anyone who wants to have oral, vaginal, and anal sex with a child. He claimed to be deeply concerned about people who want to sexually abuse children.

During his Internet surfing, he found the advertisement posted by S.A. Metcalfe. He recounted, "There was a guy that was advertising his daughter, for fun with his daughter, or a fresh time or fun time or time with his fresh daughter, something like that, you know." *Id.* at 342. Because he "was a little bit disturbed by it" he "answered it back." *Id.* He wanted to "know exactly what [the father] had in mind for his daughter." *Id.* at 343. Even so, Seymour claimed that he "didn't believe [the daughter was a 12-year-old] for a minute," even after the fictional father told him that. *Id.* at 355. He admitted that he had been the first person to mention having sex with the daughter. He did so because he wanted to "see what [the father] was going to say." *Id.* at 353. Seymour said that he had engaged in this type of exchange—searching out undesirables on the Internet to exact justice—six or seven times, but that this was the first time he had ever gone out to meet any of them.

After speaking with the father, he withdrew cash from an ATM "to have something to bait the guy with." *Id.* at 344. He then went to Romero Park "to take that guy down for sure somehow. You get him baited over, you know, get him over there. I had a cell phone. I could have called the cops, whatever it would have taken. Whatever it takes, doesn't matter, whatever it takes." *Id.* at 345. Yet when the agents arrested him, Seymour claimed that he was at Romero Park to buy marijuana. At trial, he admitted that he had lied to the

agents, deciding not to tell them about his vigilante intentions, because he "wasn't sure what to think when they first showed up. There were so many of them. . . . They didn't tell me why I was even being pulled out of my vehicle. Nobody told me anything." *Id.* at 357. Seymour never told the agents about his Craigslist conversation, instead denying that he had used his phone to access Craigslist that night. Then "when [he] got accused of trying to solicit a minor . . . [he] asked for a lawyer." *Id.* at 358.

During trial, the government cross-examined Seymour about his use of a file-sharing program called "Shareaza." Seymour's attorney objected, arguing that this questioning was impermissible under Rule 404(b) and that the government had not provided timely notice. His attorney argued that S.A. Metcalfe should be disallowed from testifying about Seymour's use of the file-sharing program, his use of certain search terms, and the child pornography on his computer. Rejecting this, the district court ruled that during his direct-examination testimony Seymour had opened the door to the government's use of that evidence.

As cross-examination continued, Seymour admitted that he had used Shareaza, stating that he found it difficult to use. He acknowledged knowing that Internet users could enter search terms into the program and then download the search results. The government then asked Seymour about some of his search terms: "rape," "15YO," "little girl," "anal," and "pedo." *Id.* at 365–66. Seymour admitted that he had entered the search terms into his computer, knowing what the search terms would likely return. The government asked, "Why are you typing those search terms into your computer and looking for those types of files?" *Id.* at 366. He answered, "Same reason I got on Craigslist to look for guys like I

- 12 -

thought he was. As you stated, it brings up the users that have those. Unfortunately, that's pretty hard to get the users' names and information off of Shareaza." *Id.* He claimed that he could get the IP addresses for the users who had uploaded the child pornography, which he could then use to locate them.

In rebuttal, S.A. Metcalfe testified that he had found on Seymour's computer the Shareaza program, a peer-to-peer network that allows people to share files. S.A. Metcalfe also testified that he had found a list of the twenty most recent search terms that had been entered on Seymour's computer, some of which related to child pornography: "pedo," "Baby J," "12YO," and "little girl." *Id.* at 381–83, 387, 392. In response to a written juror question permitted by the court, S.A. Metcalfe said that some deleted files on Seymour's computer related to child pornography. The court, reading another juror question, then asked, "[D]id you find any files on the computer of a pornographic nature involving minors?" *Id.* at 396. S.A. Metcalfe answered, "Yes." *Id.*

In surrebuttal, Seymour claimed that other people had access to his computers. He also explained that he would link these computers together and "sync" them. He claimed that the Shareaza software was already installed on his computer when he purchased it. Finally, he claimed that Shareaza was hard to use and that it enabled people to watch movies.

The jury found Seymour guilty on both charged crimes—attempted online enticement of a child, in violation of 18 U.S.C. § 2422(b), and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The district court sentenced him to the mandatory minimums for both counts: 120 months for Count One

and 60 months for Count Two, the terms to be served consecutively. It also sentenced him to a 15-year term of supervised release.

## II.  THE CONTINUANCE

Seymour appeals the district court's decision denying his October 2, 2013, request to continue the trial. We review the denial of a motion to continue for an abuse of discretion, "assigning error only if the district court's decision was 'arbitrary or unreasonable and materially prejudiced the [defendant].'" *United States v. McKneely*, 69 F.3d 1067, 1076–77 (10th Cir. 1995) (citing *United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir. 1990) (en banc)). Whether the denial is arbitrary or unreasonable depends on: (1) the diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; and (4) the need asserted for the continuance and the harm that the moving party might suffer from the district court's denial. *Rivera*, 900 F.2d at 1475 (citing *United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987)). Of these, the fourth factor is the most important. *United States v. Orr*, 692 F.3d 1079, 1100 (10th Cir. 2012).

First, Seymour argues that he diligently sought the continuance. We disagree. His alleged need for a continuance centered upon his need to dispute that the video contained

child pornography. As the district court observed, this need disappeared when it excluded the video. When a similar issue surfaced during trial—in response to the juror question about whether S.A. Metcalfe had found any child pornography files on Seymour's computer—Seymour did not renew his motion for a continuance. Although he did raise a Rule 404(b) objection, he did not at this juncture request a continuance. Additionally, it appears that the government had made this information available to Seymour, but he declined to examine it.[4] In light of everything, we do not believe that Seymour acted diligently in seeking to obtain an expert to testify about the content of his computer files. No one knew earlier or better than Seymour just what images and search terms were on his computer, so he should have known from the outset whether he would need to respond with expert testimony, assuming he felt that testimony would help more than hurt his case.

Second, Seymour argues that the continuance would have accomplished his goals. But because the district court excluded the video file, it eliminated the identified need for the continuance. On appeal, Seymour argues that an expert could have determined the number of files found on Seymour's computer and whether they contained child pornography, which could have refuted S.A. Metcalfe's testimony during trial. We think

---

[4] The government explained at trial, when Seymour objected to the introduction of this evidence, that "[t]his information was available to [Seymour's attorney] for over a month. [Seymour's attorney] declined to go out to the ICAC and look at this information." R. vol. 3, at 362.

that this need is slight, given that the actual video[5] was not introduced into evidence, and S.A. Metcalfe's testimony formed only a small part of the incriminating evidence introduced against Seymour during trial. Also weighing against his need for continuance is his failure to renew his motion when the child-pornography questions arose later in the trial.

Third, a continuance a week before trial almost always will inconvenience the opposing party, its witnesses, and the court. Although a continuance would undoubtedly have caused some inconvenience, the district court never had to weigh this factor after it prohibited the government from admitting the actual video during the trial. Because of this, the third factor is less important in our analysis than it would be in a different case.

Fourth, and most importantly, the need asserted by Seymour ceased to exist after the district court denied the government's motion by excluding the video. S.A. Metcalfe's testimony about the child pornography on Seymour's computer was a brief mention in response to a juror's question allowed by the district court. And after that, Seymour failed to request a continuance to obtain an expert. He was obligated to do so. *See c.f. United States v. Lotspeich*, 796 F.2d 1268, 1271 (10th Cir. 1986) ("Issues not raised in the district court will not be considered for the first time on appeal when, as here, 'there is no showing of an impediment to the appellant that precluded his raising the issue.'" (citing *United States v. Mitchell*, 783 F.2d 971, 995 (10th Cir.1986))). The district court had no

---

[5] S.A. Metcalfe found one movie file depicting child pornography under the file path: /Users/Master/Documents/Hold/Mount; the movie file was titled, "BabyJ-Little-Bit.avi."

continuing obligation to examine whether it should reconsider its previous denial of the continuance.[6]

When the district court later ruled on the question of whether the computer evidence was admissible at trial, it noted that, in its view, Seymour's original request for a continuance only spoke to the video clip. It explained, "And so at this point . . . the argument today is that the defendant would have secured an expert to run its own forensics on this computer, [but] that argument has not ever been brought to the Court's attention in the form of a request for an extension or a continuance of trial for that purpose." R. vol. 3, at 471. During trial, Seymour changed his rationale supporting the continuance, broadening it from needing to examine the pornographic video to determine whether it contained images of a woman, not a child,[7] to needing a general forensic examination of the computer, including search terms and the file-sharing program. Because we are tasked with determining whether the district court abused its discretion by denying the pre-trial continuance, we will examine the arguments Seymour then made to the district court. In light of his stated basis from before trial, we do not think the district court abused its discretion.

In evaluating Seymour's asserted need for a continuance, we also consider the likelihood of favorable expert testimony that the video did not contain child pornography.

_____

[6] Only in limited circumstances are district courts obligated to continue to monitor an issue, even if the parties fail to re-raise it. *See, e.g.*, *United States v. Hays*, 515 U.S. 737, 742 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction . . . ." (internal quotations omitted)).

[7] Seymour also noted that he wanted an expert to make a "determination of ways such a video could have been place[d] on the computer." R. vol. 1, at 35. This still only relates to the video and does not change our conclusion.

Seymour claimed that the pornographic video might depict an adult woman who might be willing to testify that she was the woman in the video. An attempt by Seymour to dispute that this file contained child pornography hardly seems likely to successfully bolster Seymour's defense in light of the overwhelming evidence of Seymour's guilt of the online enticement of a minor. This considerably lessens any concerns about Seymour being unfairly prejudiced by S.A. Metcalfe's responses to the jurors' questions about child pornography on Seymour's computer (not even specifying the video).[8]

Seymour argues that he was put in a "Catch-22" because of the court's denial of the motion. Because the government reserved a right to use the child pornography video clip and the Shareaza search terms in rebuttal, Seymour argues that the government infringed on his right to testify. He offers no supporting authority. As we understand Seymour's "Catch-22" argument, he is saying that the denial of a continuance left him with a choice of not testifying or of testifying with no way to counter the government's use of the evidence from his computer—the search terms seeking child pornography and the video file. For this argument to have any force, we must assume that Seymour *could* have successfully countered this computer evidence, including the presence of search terms relating to child pornography. Nothing we see in the record suggests that this was a real possibility. No expert could have erased Seymour's recent search terms, which S.A.

_____

[8] As mentioned earlier, the jury received the district court's permission to ask S.A. Metcalfe two written questions about his investigation. First, a juror asked, "[D]id you check on the . . . computers relating to this case for a history of deleted files? . . . And if so, were any of the deleted files related to child pornography?" R. vol. 3, at 395–96. Agent S.A. Metcalfe responded, "Yes" to both questions. *Id.* at 396. Second, a juror asked, "Other than the search terms, did you find any files on the computer of a pornographic nature involving minors?" *Id.* Agent S.A. Metcalfe responded, "Yes." *Id.*

Metcalfe testified would return child pornography when searched. Seymour admitted entering those search terms, claiming he had done so as part of his sleuthing to protect children.

We conclude that by excluding the video file, the district court eliminated Seymour's asserted need for a continuance. We must only look at the reasons presented to the district court at the time it denied the motion. *See United States v. Jones*, 730 F.2d 593, 596 (10th Cir. 1984) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)) ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (internal citations omitted)). It was neither arbitrary nor unreasonable to deny Seymour's motion when the district court had disallowed the evidence during the government's case-in-chief. Any complaint by Seymour regarding the introduction of the evidence after the trial began is irrelevant for our consideration of the district court's actions before trial. As we explained above, if any additional reason for continuing the trial arose after this point, it was Seymour's responsibility to raise the issue to the district court. The court was not under a continuing obligation to reconsider its previous denial throughout the trial.

For these reasons, we conclude that the district court did not abuse its discretion in denying Seymour's motion to continue.

### III. EVIDENTIARY RULINGS

In essence, Seymour's defense at trial was that he acted as a vigilante, tracking down child sex abusers. In rebuttal, S.A. Metcalfe testified about evidence obtained from a forensic examination of Seymour's computer. Seymour appeals the propriety of the district court's allowing pertinent portions of S.A. Metcalfe's testimony: (1) "[h]e was allowed to testify about search terms" found in Shareaza; (2) he was allowed to "opine that those search terms were used to search for child pornography"; and (3) he was "allowed to testify that numerous deleted and undeleted child pornography [files] were found on Mr. Seymour's computer." Appellant's Br. at 38. Seymour argues that even though the district court excluded the actual video containing child pornography as too prejudicial, it erred in admitting this "even more damaging testimony." *Id.*

The government contends that Seymour opened the door to all of this evidence.[9] Pointing to the extensive testimony Seymour offered from his family about his character trait of preventing abuse, the government asserts that Seymour "clearly intended to show the jury that [he] was not a person who would abuse a child, but rather would take matters into his own hands to rescue a child he thought was being abused." Appellee's Br. at 22. This, the government argues, was a character trait that Seymour put at issue, making the evidence admissible under Fed. R. Evid. 404(a)(2).

We review evidentiary matters for an abuse of discretion and will not reverse the district court if its decision "falls within the bounds of permissible choice in the

---

[9] The government disputes whether Seymour properly preserved this Rule 403 issue. While Seymour fails to point us to a particular point in the record where he preserved this issue, our review of the record does reveal that Seymour at least mentioned the Rule 403 issue, even if in response to the district court's first raising it.

circumstances and is not arbitrary, capricious or whimsical." *United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011) (quoting *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006)). "[W]e will not reverse unless the error affected a substantial right." *United States v. Levine*, 970 F.2d 681, 688 (10th Cir. 1992) (citing Fed. R. Crim. P. 52).

### A.  Rule 404(a)(2) and Rule 404(b)

Seymour argues that the district court abused its discretion in admitting this evidence. He assumes that the district court admitted the evidence under Rule 404(b), which the government disputes. Citing Rule 404(b), he asserts that the government failed to provide proper notice that it would seek to admit evidence of the search terms on his computer. The government argues that it did not offer this evidence under Rule 404(b), but instead did under Rule 404(a)(2). Although the government did not specifically cite to Rule 404(a)(2) when seeking to admit this evidence, it did argue that "the defendant has vociferously protested that he is not someone that's sexually interested in children. He regards those people as perverts. [The government is] bound to inquire of him about search terms that were used on this file-sharing program that is often used to obtain child pornography . . . ." R. vol. 3, at 361. We agree with the government that this evidence was admitted under Rule 404(a)(2), even if the government did not specifically cite to that rule.

During his defense, Seymour offered a substantial amount of opinion testimony from his son, wife, sister, and mother concerning his character trait of protecting children,

women, and animals from the violence of others. They testified about specific instances where Seymour had assisted others suffering violence. In addition, Seymour himself testified that he thought people who looked at child pornography were "perverts." R. vol. 3, at 349. As such, when—on rebuttal—the government introduced evidence that Seymour had searched for child pornography on his computer, it was attempting to rebut the character trait offered by Seymour and his witnesses by pointing to specific acts not in accordance with the asserted character trait.

Seymour's character-trait evidence followed this chain: (1) he has always come to the aid of others throughout his life; (2) he was logged on to Craigslist that night trying to protect the city of Cheyenne from perverts and undesirables; (3) he had done this on other occasions, although he had never directly acted to protect anyone before based on his online investigations; (4) he stumbled across a father soliciting paid sex with his 12-year-old daughter, Bri; (5) Bri needed protection; (6) Seymour baited the father so that he could protect Bri; and (7) Seymour went to the park to protect Bri.

The government argues that the computer evidence it offered through S.A. Metcalfe was "highly probative and admissible" because "[o]nce the Defendant presented this character trait testimony, evidence bearing on a trait indicating that he is sexually interested in children" rebutted that trait. Appellee's Br. at 26. We have not found a case in which an appellate court has applied Rule 404(a)(2) in this exact factual manner.

Thus, does being sexually interested in children rebut Seymour's vigilante character trait? At trial, Seymour did not dispute that he sent the emails to the fictional father or that he went to Romero Park. Instead, he argued that he sent the emails and went to the

park to protect Bri. In an attempt to rebut Seymour's character trait, the government introduced specific instances where Seymour had acted in a manner suggesting that he is sexually interested in children. If Seymour is sexually interested in children, it stands to reason that he sent the emails and went to Romero Park for sexual gratification, rather than out of a desire to protect Bri. The jury was left to decide why Seymour went to the park. Based on its verdict, the jury believed the government.

In *United States v. McHorse*, 179 F.3d 889, 901–02 (10th Cir. 1999), the defendant testified, "I get along well with all children. I respect and love children." *Id.* at 901. He also testified that he would never mistreat them. *Id.* The court concluded on appeal that the defendant had "put his own character at issue by unswervingly insisting that he 'was good to everyone.'" *Id.* at 902. As such, the government's cross-examination regarding incidents where the defendant was alleged to have sexually abused his daughter and half-sister was appropriate. *Id.*

While not directly in line with the facts from *McHorse*, we think that the situation here is sufficiently analogous. Seymour introduced character evidence meant to suggest that he went to the park to protect Bri. The government rebutted that evidence by introducing specific instances of his conduct to show that he was sexually interested in children and went to the park for his own sexual pleasure. "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject [that] the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson v. United States*, 335 U.S. 469, 479 (1948). "[O]nce evidence of defendant's character is offered by defendant (either through defendant or a

defense witness), the government may counter that evidence on cross-examination by referencing relevant specific instances of conduct [under Rule 405(a)]." *McHorse*, 179 F.3d at 901–02.

Seymour cites no authority to support his argument that the government must provide notice under Rule 404(a)(2)(A), as it must under Rule 404(b). Arguing against a notice requirement, the government cites a Sixth Circuit case concluding that Rule 404(a) does not require the government to provide pretrial notice of the evidence it intends to introduce. *See United States v. Roper*, 135 F.3d 430, 434 (6th Cir. 1998) ("Roper 'opened the door' for the government to discredit his character during its cross-examination, as the government effectively accomplished, and by introducing extrinsic, substantive, rebuttal evidence of his criminal history of previous cocaine base sales <u>without resorting to or relying upon Rule 404(b) and the limitations of its notice requirement</u>." (emphasis added).

We agree with the government and conclude that the plain language of Rule 404(a)(2) has no notice requirement. *See id.*; *see also generally* 1 McCormick on Evidence § 191 (Kenneth S. Broun, ed., 7th ed. 2013) (citing 1A Wigmore, Evidence § 58 (Tillers rev. 1983)) ("[O]nce the defendant gives evidence of pertinent character traits to show that he is not guilty, his claim of possession of these traits—but only these traits—is open to rebuttal by cross-examination or direct testimony of prosecution witnesses."). Therefore, after Seymour offered evidence of his character trait—that he searched online for abusers as part of his effort to protect others—the government was allowed to rebut that evidence under Rule 404(a)(2) without providing any notice. And the government's proof that

Seymour used child-pornography search terms on his computer undermined his claim that he had agreed to meet the father (S.A. Metcalfe) to protect the daughter, Bri. In short, it provided another basis to argue that Seymour went to meet Bri for his own sexual pleasure. Quite simply, faced with overwhelming evidence of guilt, the jury disbelieved Seymour's account.

We therefore affirm the district court's admitting the computer evidence under Rule 404(a)(2). We now turn our review to Seymour's argument that the evidence still should have been excluded under Rule 403, which allows district courts to exclude evidence when its probative value is substantially outweighed by a danger of unfair prejudice.

### B.  Rule 403

Under Rule 403, a district court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See United States v. Archuleta*, 737 F.3d 1287, 1292–93 (10th Cir. 2013). Generally speaking, unfair prejudice results when the evidence "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *Id.* at 1293 (quoting *United States v. Irving*, 665 F.3d 1184, 1213–14 (10th Cir. 2011).

Seymour argues that the district court erred under Rule 403 by allowing S.A. Metcalfe to testify about search terms found on Seymour's computer and whether those terms are typically used to search for child pornography. Seymour also argues that the district court erred by directing S.A. Metcalfe to answer a juror's written question asking whether

Seymour's computer contained any deleted and undeleted child pornography files.[10] The main thrust of Seymour's prejudice argument is that the district court had concluded earlier that the video file containing child pornography failed Rule 403's balancing test. He suggests that the evidence introduced, which did not include the actual video file, was "even more damaging testimony." Appellant's Br. at 38. He then argues that "[t]he opening of the door does not change the finding of prejudice." *Id.*

As an initial matter, we reject his contention that the evidence introduced was "even more damaging" than the video of child pornography. We think that this evidence is considerably less prejudicial. Allowing a jury to see a video of child pornography depicting an adult male engaged in sexually explicit conduct with a prepubescent female[11] differs vastly from telling it that Seymour's computer contained images of child pornography and identifying the search terms entered into his file-sharing program. The actual video would almost certainly have inflamed the jury's passions in a way that the limited testimony here would not. *See United States v. Loughry*, 660 F.3d 965, 972–74

---

[10] Seymour also asserts that reversal is warranted because the district court conducted no analysis under Rules 403 or 404 before admitting this evidence. We disagree. Our review of the record shows numerous occasions where the district court considered both Rules 403 and 404. In particular, the district court explained, "As I've indicated previously, the Court's conclusion to allow testimony on the search terms, under the balancing test—certainly the search terms created prejudice, but we all have to appreciate that the government's evidence is always prejudicial to the defendant. . . . The issue is whether the prejudice is unfair compared to the probative value." R. vol. 3, at 471. Accordingly, we reject his contention that we must reverse because the district court did not conduct Rules 403 or 404 analyses. Instead, we conclude that the district court conducted a sufficient inquiry.

[11] Although in court filings the government attributed this finding to S. A. Metcalfe, the video was not introduced in evidence and we have nothing to establish this was so beyond the agent's characterization of what he saw when viewing the video clip.

(7th Cir. 2011) (stating that videos of child pornography have a "strong tendency to produce intense disgust").

We also conclude that this evidence had probative value. We discussed this above when considering whether this evidence was admissible under Rule 404(a)(2). Simply put, this evidence was probative because it rebutted a character trait that Seymour claimed he possessed. This evidence tended to show that he did not possess that character trait. During his defense, Seymour offered a substantial amount of opinion testimony from his son, wife, sister, and mother concerning his desire to protect children, women, and animals from the violence of others. They testified about specific instances where Seymour had assisted others suffering violence. In addition, Seymour himself testified that he thought people who looked at child pornography were "perverts." His defense culminated in Seymour's testimony that he communicated with Bri's father and went to Romero Park all in his effort to protect Bri.

When during its cross-examination of Seymour and during its rebuttal, the government introduced evidence that Seymour had used search terms associated with child pornography, it was attempting to impeach Seymour's testimony and generally rebut his defense by offering a contrary version of Seymour's intent that evening. Seymour did not dispute that he sent the emails to the fictional father or that he went to Romero Park. Instead, he argued that he sent the emails and went to the park to protect Bri. If Seymour would sexually abuse children, it stands to reason that he sent the emails and went to Romero Park for sexual gratification, rather than out of a desire to protect

Bri. The jury was left to decide why Seymour went to the park. Based on its verdict, the jury believed the government.

To support his argument that the danger of unfair prejudice substantially outweighed the testimony's probative value, Seymour cites a host of Seventh Circuit cases. For instance, he submits *United States v. Ciesiolka*, 614 F.3d 347, 349 (7th Cir. 2010), where the government prosecuted the defendant for the online enticement of a child. In that case, there was a dearth of evidence to establish all elements of the online enticement charge. To prove that the defendant was sexually interested in children, the government introduced images of child pornography found on his computer under Rule 404(b). *Id.* at 355–57.

We think that *Ciesiolka* has little persuasive value in this case given that the evidence against Seymour was very strong and the government did not offer the evidence to prove an element of the crime during its case-in-chief. Additionally, the Seventh Circuit's main issue with the district court in *Ciesiolka* was its failure to explain "its bare-bones conclusion that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Id.* at 357. The district court here did much more than did the district court in *Ciesiolka*. It explained that it was Seymour's defense—that he went to Romero Park to protect Bri—that "highlighted and elevated the probative value of both the search terms and the issues associated and questions relating to the agent's opinion on child pornography files." R. vol. 3, at 471. "It was the defendant that increased the probative value. And it's difficult for the Court to understand how the defendant can now claim unfair prejudice associated with the evidence." *Id.*

We conclude that the district court did not abuse its discretion under Rule 403 in admitting the evidence found on Seymour's computer. We think that there was limited danger of unfair prejudice, insufficient to substantially outweigh the testimony's probative value. We therefore affirm the district court as to Rule 403.

## IV. SUFFICIENCY OF THE EVIDENCE

Seymour challenges the sufficiency of the evidence for his conviction under 18 U.S.C. § 924(c). We review this issue de novo. *United States v. Bowen*, 527 F.3d 1065, 1075 (10th Cir. 2008). We view the evidence in the light most favorable to the government, and we ask whether a reasonable juror could find the defendant guilty beyond a reasonable doubt. *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008).

To support a § 924(c) conviction, the government must show that: (1) the defendant committed a crime of violence; (2) while carrying a firearm; and (3) during and in relation to the crime of violence. *See United States v. Munro*, 394 F.3d 865, 870–71 (10th Cir. 2005). In *Munro*, we held that the online enticement of a child is a violent crime under § 924(c). *Id.* We explained, "In cases involving sex crimes against minors, we have found that 'there is always a substantial risk that physical force will be used to ensure [a] child's compliance' with an adult's sexual demands." *Id.* at 870 (citing *United States v. Vigil*, 334 F.3d 1215, 1221 (10th Cir. 2003)). We acknowledged that online enticement involves no actual abuse, but we still concluded that "the risk involved in attempted sexual abuse of a minor is significant enough to render it a crime of violence." *Id.* at 871.

We note that the Supreme Court has held that "the 'generally accepted contemporary meaning' of the word 'carry' includes the carrying of a firearm in a vehicle." *Muscarello v. United States*, 524 U.S. 125, 139 (1998). Further, in *Munro* we also held that carrying a firearm when going to meet the minor—even though the enticement crime occurred online and even if a person always carries a gun for personal safety—was sufficient evidence to support a § 924(c) conviction. *Munro*, 394 F.3d at 871.

> Munro also suggests that the gun was not related to the crime because he always carried a gun, particularly at night to places he perceived as unsafe. This argument fails. Even if Munro routinely carried a gun for a variety of reasons, he still could carry a gun "during and in relation to" the crime he was convicted of in this case. Furthermore, a reasonable juror could conclude that Munro brought the gun, not because he felt he was in an unsafe area—an elementary school playground, but in case Chantelle refused his advances. On this evidence, we have no doubt a reasonable jury could have "reached the disputed verdict."

*Munro*, 394 F.3d at 871 (citations omitted).

Seymour attempts to distinguish his case from *Munro*, arguing that in *Munro* the defendant had the gun in his pocket, while Seymour had the gun in the center console of his truck.[12] We are unpersuaded that this difference matters. Given the Supreme Court's decision in *Muscarello*, we do not think that carrying the gun in his truck rather than on

---

[12] He also cites to a number of cases where we held that mere proximity to a firearm was insufficient to support a conviction under § 924(c). *See, e.g.*, *United States v. Iiland*, 254 F.3d 1264, 1274 (10th Cir. 2001); *United States v. Hall*, 20 F.3d 1084, 1089–90 (10th Cir. 1994). Seymour's case, however, did not involve mere proximity. Instead, as we explained in *Munro*, it would be perfectly reasonable for a juror to infer that he had brought the gun with him to Romero Park to subdue the child. Seymour also argues that "all the improperly admitted evidence regarding child pornography on Mr. Seymour's computer prejudiced the jury against Mr. Seymour." Appellant's Br. at 46. We do not find this argument persuasive because we concluded above that the evidence from Seymour's computer was properly admitted.

his person makes any difference under § 924(c). *See* 524 U.S. at 139. Just as in *Munro*, a jury could reasonably conclude that Seymour brought the gun not because he always carried a gun or had gone shooting earlier that day, but instead to compel Bri to accede to his sexual advances. *See* 394 F.3d at 871.

We therefore affirm Seymour's § 924(c) conviction.

## V.  CONCLUSION

We affirm the district court as to all matters raised in this appeal.

ENTERED FOR THE COURT


Gregory A. Phillips
Circuit Judge